IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLAVIN IVY, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 1:20-cv-00265-RAL |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN WETZAL, et al. | ) | THE HON. RICHARD A. LANZILLO |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| Defendants | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | ON DEFENDANTS' MOTION |
| | ) | TO DISMISS |
| | ) | [ECF No. 13] |

I.      Introduction

Plaintiff Glavin Ivy (Ivy), an inmate incarcerated at the State Correctional Institution at

Forest (SCI-Forest), commenced this action against nine employees of the Pennsylvania Department

of Corrections (DOC).  His six-count Complaint asserts claims pursuant to 42 U.S.C. § 1983 and

pendent state law claims.[1]  ECF No. 1.  Count I asserts a First Amendment retaliation claim against

all Defendants.  *Id.*, ¶ 88.  Count II asserts a First Amendment freedom of association claim against

all Defendants.  *Id.*, ¶ 89.  Count III asserts a state law claim of conspiracy against all Defendants.

*Id.*, ¶ 90.  Count IV asserts a claim for invasion of privacy under the First, Fourth, and Fourteenth

Amendments against Defendant Librarian Winters and Lauren Blake.  *Id.*, ¶ 91.  Count V asserts a

claim for invasion of privacy under state law against Winters and Blake.  *Id.*, ¶ 92.  Count VI asserts

a claim for violation of his right to due process under the Fourteenth Amendment against all

Defendants.  *Id.*, ¶ 93.  He has sued all Defendants in both their official and individual capacities.

---

[1] Ivy initiated this action by filing a motion to proceed *in forma pauperis*.  ECF No. 1.  The Court granted this motion and docketed his complaint.  ECF Nos. 4-5.

ECF No. 5, ¶ 9.  The Defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss all of Ivy's claims except his retaliation claims.  ECF Nos. 13, 14.  Ivy has filed a brief in opposition to the motion.  ECF No. 19.  For the foregoing reasons, the Defendants' motion will be GRANTED in part and DENIED in part.  Ivy will be granted leave to file an amended complaint in accordance with the guidance provided in this Opinion.[2]

II.      Ivy's Allegations

The Court accepts the following factual allegations in Ivy's Complaint as true for purposes of Defendants' motion to dismiss.  *See US Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  Ivy "tirelessly stud[ies] the law and engage[s] in political activism for the purpose of prison reform and rectification of statewide injustice on behalf of those responsible for carrying out the law."  ECF No. 5, ¶ 17.  He voluntarily assists other prisoners with their legal cases.  *Id.*, ¶¶ 19-20.  According to DOC policy, inmates can sign up for one two-hour law library session per week.  *Id.*, ¶ 11.  If the inmate has an upcoming deadline, DOC policy allows three two-hour library sessions per week.  *Id.*, ¶ 12.  "Library staff" implemented a DOC policy that requires inmates to submit legal documentation before they received this additional time.  *Id.*, ¶ 15.  This documentation is photocopied and preserved.  *Id.*  Librarians Winters and Blake had a practice of reading the material that inmates draft and print in the library at all times relevant to this action.  *Id.*, ¶ 14.

Ivy is litigating other cases in this United States District Court and in other courts.  *Id.*, ¶ 21. Ivy received an appellee's brief in "1274 WDA 2019" on December 18, 2019, and went to the law library on December 20, 2019 for his scheduled law library time to prepare his reply brief.  *Id.*, ¶¶ 22–24.  While there, Librarian Winters requested proof of Ivy's upcoming deadline to authorize

---

[2] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and it can exercise pendent jurisdiction over the state law claims under 28 U.S.C. § 1337.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636.  *See* ECF Nos. 17, 18.

giving him additional library time. *Id.*, ¶ 25. Ivy provided the docket sheet for the case and the appellee's brief to Winters who, "in conformity with the practice and custom," photocopied these documents for library records. *Id.*, ¶¶ 26-27. Winters told Ivy she would have this information and his upcoming deadline "verified." *Id.*, ¶ 30. Ivy expected privacy in his legal paperwork, which Winters showed to inmate Haggerty—an unlicensed inmate law clerk. *Id.*, ¶ 80.

Ivy returned to the law library the next day, as scheduled. *Id.*, ¶ 36. He typed two motions related to his criminal case. He also typed four pages of a petition for habeas corpus for another inmate, Ricky Fritchman, who he had been assisting without compensation. *Id.*, ¶¶ 32, 35, 37. While doing so, Haggerty told him that he had reviewed his legal mail at Winters' direction to verify that he had an upcoming deadline. *Id.*, ¶¶ 38, 39. When Ivy printed his documents, which go to a printer on the librarian's desk, Winters read them and confiscated the documents relating to Fritchman. *Id.*, ¶¶ 13, 40. Ivy told Winters that she could not censor what he typed without a legitimate reason, such as a security issue. *Id.*, ¶ 41. Nevertheless, Winters seized the papers related to Fritchman and issued him a confiscation slip. *Id.*, ¶¶ 42-43; ECF No. 5-1. Ivy then told her that he would file a lawsuit about this. *Id.*, ¶ 44. Winters said, "dumb inmates threaten to sue me all the time." *Id.*, ¶ 45. Ivy explained how he thought his rights were violated. *Id.*, ¶ 46. As Ivy left the library, Winters threatened not to schedule him for additional time related to his pending deadline in "1274 WDA 2019." *Id.*, ¶ 47.

Ivy was later escorted to the RHU, although he learned afterwards that officials' usual practice at the time was to confiscate the other inmate's legal material without taking further action. *Id.*, ¶ 45. On December 21, 2019, Ivy was issued misconduct B766832 for "threatening an employee or their family with bodily harm" (Class I, # 15) and "using abusive, obscene, or inappropriate language to an employee" (Class I, # 22). *Id.*, ¶ 49; ECF No. 5-2. Two days later, Hearing

3

Examiner Fiscus dismissed the misconduct without prejudice, writing that he "believe[d] the misconduct to be in error." *Id.*, ¶ 52; ECF No. 5-3.

Librarian Winters then reissued the misconduct with a few additional sentences, including the two original charges and adding possession of contraband because Ivy had another inmate's legal paperwork (Class I, # 36). *Id.*, ¶ 53; ECF No. 5-4. Ivy insists that he never threatened Winters with bodily harm and that she "exaggerated the language" he used and "trumped-up the facts." *Id.*, ¶¶ 55-56. During the misconduct hearing conducted by Fiscus, Ivy asked what DOC policy forbids him working on another inmate's legal work, but Fiscus did not explain. *Id.*, ¶¶ 59-60. Fiscus found Ivy guilty of all three charges and sanctioned him to seventy-five days of disciplinary custody in the RHU. *Id.*, ¶ 61. He wrote that he believed Winter's report over Ivy's denials. ECF No. 5-5. He also wrote that another inmate's legal work was contraband. *Id.* Ivy alleged, upon information and belief, that between the time Fiscus dismissed the first misconduct without prejudice and the reissued misconduct, Fiscus informed Winters that it would be better to charge Ivy with possession of contraband. ECF No. 5, ¶ 64. Ivy alleges that Winters and Fiscus retaliated against Ivy because he expressed "his intent to seek vindication of his constitutional rights in court." *Id.*, ¶ 81. He further alleges that all Defendants retaliated against him by issuing the misconduct against him for "(1) expressing his intent to sue which constituted protected free speech, and (2) for assisting another inmate with seeking habeas relief by typing a document which also constituted protected free speech." *Id.*, ¶ 88.

On appeal, Gustafson, Perry, Adams, and Mongelluzzo of the Program Review Committee (PRC) upheld the misconduct. ECF No. 5-6. They wrote that DC-ADM 007 Section 2 prohibits an inmate from possessing the legal work of another. Ivy contends that this provision applies only to the job duties of inmate law library clerks, which he is not. ECF No. 5, ¶ 74. Ivy also says he had

purchased the paper on which the legal documents were typed, Fritchman never had possession of the papers before they were confiscated, and they were not put on Fritchman's property sheet. *Id.*, ¶ 69.

Ivy seeks compensatory and punitive damages against all Defendants. *Id.*, ¶¶ 94-95. He asks for declaratory relief that "prisoners cannot be disciplined for, or wholly prevented from, assisting other inmates in the preparation of legal filings" and a declaration that "an inmate's efforts in assisting other inmates in the preparation of legal filings is protected under the Free Speech clause and/or the Association clause of the 1st Amendment to the U.S. Constitution, not because of its legal nature, but because it is a form of free speech and/or association like any other." *Id.*, ¶¶ 96-97. He also requests an injunction "enjoining the Defendants and their subordinates from (1) requiring D.O.C. prisoners to surrender legal documentation to D.O.C. employees for the purpose of inspection, photocopying and preservation, and (2) from punishing prisoners for assisting other prisoners with their cases." *Id.*, ¶ 98. He demands a jury trial and costs of his suit. *Id.*, ¶¶ 99–101.

III.    Standard of Review

A.   Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A complaint should only be dismissed pursuant to Rule 12(b)(6) if it fails to allege "enough facts to

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955 (rejecting the traditional Rule 12(b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).  In making this determination, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions.  *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)).  Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts in the complaint.  *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the Court accept legal conclusions disguised as factual allegations.  *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.  *See also McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  This determination is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

B.  *Pro Se* Litigants

While the foregoing principles apply to all complaints in federal court, *pro se* complaints, "however inartfully pleaded," are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-521, 92 S. Ct. 594, 30 L.Ed.2d 652 (1972).  If the court can reasonably read a *pro se* complaint to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements.  *Boag v. MacDougall*, 454 U.S. 364, 102 S. Ct. 700, 70 L. Ed. 2d 551 (1982); *United States ex rel. Montgomery v. Brierley*, 414 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance").

IV.    Discussion

A.  Sovereign Immunity Bars Ivy's Official Capacity Claims for Money Damages

Ivy has sued each Defendant in both his or her official and individual capacities.  *Id.*, ¶ 9. The Defendants argue that Ivy's official capacity claims against them must be dismissed because the DOC and its employees are protected by sovereign immunity under the Eleventh Amendment, an immunity which Pennsylvania has not waived.  ECF No. 14, pp. 4–6.  The Defendants are correct in that they have immunity for official capacity claims seeking monetary damages.  The Eleventh Amendment proscribes actions for money damages in the federal courts against states, their agencies, and state officials acting in their official capacities.  *Laskaris v. Thornburgh*, 661 F.2d 23 (3d Cir. 1981) (Pennsylvania); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977) (state agencies); *Edelman v. Jordan*, 415 U.S. 651 (1974) (state employees acting in their official capacity).  The DOC,

as an agency of the Commonwealth of Pennsylvania, and its agents and employees are entitled to Eleventh Amendment immunity for money damages.  *See Brown v. Smith*, 2019 WL 2411749 (W.D. Pa. June 7, 2019).  Because all Defendants in this action are DOC employees who were acting within the scope of their employment, Ivy's claims for monetary relief against them in their official capacities will be dismissed with prejudice.

As Ivy correctly argues, however, the Eleventh Amendment does not provide immunity for claims for injunctive or declaratory relief.  ECF No. 19, p. 9 (citing *Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985)).  "In an injunctive or declaratory action grounded on federal law, the State's immunity can be overcome by naming state officials as defendants."  *Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985) (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984); *Ex parte Young*, 209 U.S. 123 (1908)).  Thus, Eleventh Amendment immunity does not provide a basis to dismiss Ivy's official capacity claims for injunctive and declaratory relief.  *See also Laskaris*, 661 F.2d at 26.

B.  Lack of Personal Involvement

The Defendants have moved to dismiss all claims against DOC Secretary John Wetzel based on his lack of personal involvement, arguing that there are no allegations he personally participated in the alleged wrongs, he cannot be held liable solely on a supervisory capacity, and Ivy has made insufficient allegations to support that he adopted or endorsed an "unconstitutional policy, practice, or custom."[3]  ECF No. 14, pp. 6–8.  Defendants also argue that the claims against Gustafson, Perry, Adams, and Mongelluzzo should be dismissed because they have been sued "based solely on their participation on 'the Program Review Committee'" and hearing misconduct appeals.  *Id.*, p. 8.  Defendants have also moved to dismiss the failure to train claim against Dombroski based on lack

---

[3] Although Ivy's complaint calls him "Wetzal,", the Court uses the correct spelling of John Wetzel's name.

of personal involvement and the general insufficiency of the allegations of the Complaint to support the claim against him.  *Id.*, p. 9.

A defendant in a § 1983 action "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."[4]  *Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (citations removed).  It is the plaintiff's burden to "show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. Sept. 14, 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)).  Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient.  *See Van Tassel v. Piccione*, 608 Fed. Appx. 66, 69-70 (3d Cir. 2015).

To begin, the mere fact that Wetzel was a "supervisor" or had supervisory authority, standing alone, cannot support liability under § 1983.  *Hepler v. Wetzel*, 2019 WL 1923004, at *5 (W.D. Pa. Apr. 30, 2019) (citing *Capone v. Marinelli*, 868 F.2d 102, 106 n.7 (3d Cir. 1989)).  This is because "[l]iability may not be imposed under § 1983 on the traditional standards of *respondeat superior*."  *Id.*  Thus, Wetzel cannot be held liable under a *respondeat superior* theory.  *Iqbal*, 556 U.S. at 677 ("In a § 1983 suit…[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

But "two theories of supervisory liability" are available under § 1983 upon a proper factual showing.  *Santiago v. Warminster Tp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010).  First, "supervisors can be

---

[4] 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

liable if they 'established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)). Ivy alleges that, "Wetzel, as a policy maker for the DOC did create an unconstitutional policy, practice, or custom which directed prison personnel under his supervision to (1) photocopy and keep records of inmate's private legal documentation, and/or (2) to confiscate paperwork done on behalf of another inmate, and/or (3) to punish inmates for assisting other inmates in preparing legal documentation." ECF No. 5, ¶ 86. He adds that, "[t]hese policy, practices, and customs of John Wetzel were the moving force behind the violations of Plaintiff's constitutional rights." *Id.*, ¶ 87. This conclusory, thread-bare allegation is insufficient to support a plausible inference that Wetzel established and maintained an unconstitutional policy or practice. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 223 (3d Cir. 2015) ("[T]o establish a claim against a policymaker under § 1983 a plaintiff must allege and prove that the official established or enforced policies and practices directly causing the constitutional violation."). *See also Coulston v. Superintendent Houtzdale SCI*, 651 Fed. Appx. 139, 143 (3d Cir. 2016) ("conclusory legal allegations that [the DOC Secretary] is liable for 'creating and enforcing an [unconstitutional] policy' do not suffice to state a claim."). Additionally, "[t]o presume that the [ ] practices arose from [Wetzel]'s policies merely because of [his] position as [DOC Secretary] is to rely on *respondeat superior*," a theory of liability unavailable in § 1983 actions. *See Parkell v. Danberg*, 833 F.3d 313, 331 (3d Cir. 2016).

Under the other theory, a supervisor may be held liable when "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Id.* (quoting *A.M.*, 372 F.3d at 586). Although a supervisor cannot encourage constitutional violations, "a supervising public official has [no] affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir.

1986); *Brown v. Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990).  Ivy's Complaint fails to allege facts to support any form of supervisory liability against Wetzel.

Ivy also fails to plead the personal involvement of Dombroski on the allegation that he trained Winters to unconstitutionally confiscate inmates' legal papers.[5]  "A supervising authority may be liable under § 1983 for failing to train . . . when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact." *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  To prevail, the plaintiff must "identify a failure to provide specific training that has a causal nexus with [his] injuries and must demonstrate that the absence of that training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).  In the failure to train context, deliberate indifference can be established by demonstrating that: "(1) [the supervisor knew] that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh*, 742 Fed. Appx. 628, 632 (3d Cir. 2018) (quoting *Doe v. Luzerne County*, 660 F.3d 169, 179 (3d Cir. 2011)).  The failure to train an employee must be a choice on the part of the supervisor or supervising entity knowing that the training that is (or is not) being provided is insufficient for the employees and the choices they encounter on the job.  *Canton*, 489 U.S. at 388–90.

---

[5] Ivy alleges that Dombroski, "did train and directly authorize Defendant Librarian Winters and Defendant Librarian Blake to confiscate legal work done by inmates on behalf of other inmates, and/or to issue these inmates misconducts." ECF No. 5, ¶ 85.

Here, Ivy has not identified any specific training that he believes was deficient or should have been provided.  *See Joines v. Twp. of Ridley*, 229 Fed. Appx. 161, 163 (3d Cir. 2007).  He has also failed to plead any facts to support an inference that the absence of that training "reflect[ed] a deliberate indifference to whether the alleged constitutional deprivations occurred."  *Reitz*, 125 F.3d at 145.  For example, nothing in the pleadings suggests that Dombroski was aware that DOC employees had a history of similar alleged First Amendment violations.  *See Simpson v. Ferry*, 2016 WL 4247546, at *7 (E.D. Pa. Aug. 10, 2016) (cleaned up) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for…failure to train.").  Absent such allegations, Ivy's failure to train claim must fail.  Because the Court concludes, however, that amendment of this claim would not be futile, Ivy will be provided an opportunity to file a curative amendment.  In addition, the opportunity to amend is also appropriate because the Complaint intimates that Ivy may be able to allege facts to support alternative theories of liability against Dombroski.

The Defendants correctly argue that the participation of Gustafson, Perry, Adams, and Mongelluzzo in the misconduct appeal process does not establish their personal involvement in conduct actionable under a § 1983 claim.  ECF No. 14, p. 8.  *See Watson v. Rozum*, 2012 WL 5989202, at *5 (W.D. Pa. Oct. 29, 2012) (collecting cases), *report and recommendation adopted*, 2012 WL 5989245 (W.D. Pa. Nov. 29, 2012).  "[T]he appellate review of a misconduct determination, without more, is insufficient to maintain a claim that these Defendants were personally involved in [the hearing examiner's] alleged due process violations."  *Stockton v. Wetzel*, 2017 WL 3034800, at *5 (M.D. Pa. July 18, 2017) (citing *Washington v. Showalter*, 494 Fed. Appx. 268, 271-72 (3d Cir. 2012)).  *See also Peay v. Fisher*, 2017 WL 1128451, at *13 (M.D. Pa. Mar. 24, 2017) (the "failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation.") (citation omitted), *aff'd*, 763 Fed. Appx. 248 (3d Cir. 2019).  Allegations that Gustafson, Perry,

Adams, and Mongelluzzo reviewed and denied Ivy's misconduct appeals do not establish that they participated in or approved of any alleged constitutional violations. *See Saisi*, 822 Fed. Appx. at 48. *See also Coulston v. Glunt*, 2014 WL 808762, at \*6 (W.D. Pa. Fed. 28, 2014) (dismissing defendants who only participated in appeals of misconducts and grievances). These claims against Gustafson, Perry, Adams, and Mongelluzzo will be dismissed with prejudice.

C.  Ivy States a First Amendment Claim Against Defendant Winters.

Ivy alleges in Count II that all Defendants violated his First Amendment rights when they subjected him to a misconduct for assisting another inmate to prepare a petition for writ of habeas corpus. ECF No. 5, ¶ 89. He seeks "declaratory relief establishing that an inmate's efforts in assisting other inmates in the preparation of legal filings is protected under the Free Speech clause and/or the Association clause" of the First Amendment. *Id.*, ¶ 97. The Complaint asserts that such a communication is protected by the First Amendment not because it is entitled to special, or heightened, protection due to "its legal nature, but because it is a form of free speech and/or association like any other."[6]  *Id.*  The allegations of Ivy's Complaint are sufficient to state a First Amendment claim actionable under § 1983.

"[A]n inmate's constitutional rights are 'necessarily limited.'"  *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010) (quoting *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999)).  Nevertheless, "it is settled law that an inmate 'retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'"  *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).[7]  When examining the free speech rights of

---

[6] Although Count II only expressly raises the "right of Association under the First Amendment" [ECF No. 5, ¶ 89], a liberal reading of the *pro se* Complaint, which our standard of review requires, reveals that Ivy asserts violations of multiple First Amendment rights.  *See Boag*, 454 U.S. 364.

[7] The First Amendment applies to the states by incorporation through the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

inmates, the Supreme Court in *Shaw v. Murphy* applied the test from *Turner v. Safley*, holding that "restrictions on inmate-to-inmate communications pass constitutional muster only if the restrictions are reasonably related to legitimate and neutral governmental objectives."  532 U.S. 223, 231 (2001) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  In *Shaw*, the Supreme Court declined to distinguish between legal and non-legal speech of prisoners, refusing to give prisoner-to-prisoner legal assistance any First Amendment protection "above and beyond the protection normally accorded prisoners' speech."  532 U.S. at 231.  Under the *Turner* test, a prison regulation that "impinges on inmates' constitutional rights" is "valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The Court applies a four-part test to assess the overall reasonableness of the regulation: (1) whether the regulation or practice bears a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether prisoners have alternative ways of exercising the circumscribed right; (3) "[what] impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether alternatives exist that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.  *See Turner*, 482 U.S. at 89-90.  "If the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor."  *Shaw*, 532 U.S. at 229-30 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

Here, the record is not sufficiently developed to allow the Court to determine whether application of the *Turner* factors defeats Ivy's claim.  Ivy engaged in communicative activity when he prepared another inmate's habeas petition which at least implicates First Amendment interests. Whether his punishment for this communication violates the First Amendment can only be ascertained through factual development of the record.  While a court may sometimes be in a position to apply the *Turner* factors based on the pleadings alone, often a factual record is necessary

to assess whether the regulation or practice is reasonably related to legitimate penological interests. *See Ramirez v. Pugh*, 379 F.3d 122, 126–30 (3d Cir. 2004) (reversing grant of a motion to dismiss and remanding for development of the factual record).  This is such a case.

The *Turner* analysis applies to Ivy's First Amendment associational rights claim as well as his free speech claim.  *See Overton v. Bazzetta*, 539 U.S. 126 (2003) (reviewing a trial record).  This "analysis is exceedingly fact-intensive and does not lend itself to resolution on a motion to dismiss." *Enoch v. Perry*, 2020 WL 4057643, at *10 (W.D. Pa. July 20, 2020) (slip copy).  *See, e.g., Dean v. Tice*, 2020 WL 3037194, at *3 (W.D. Pa. May 13, 2020), *report and recommendation adopted*, 2020 WL 3036630 (W.D. Pa. June 5, 2020); *Arnold v. Smith*, 2020 WL 362691, at *5 (M.D. Pa. Jan. 22, 2020).  Indeed, in *Turner* itself, the Court had the benefit of trial testimony to assess restrictions on inmate-to-inmate written correspondence.  *Turner*, 482 U.S. at 82.  Similarly, in *DeHart*, the Third Circuit assessed a district court's consideration of the *Turner* factors and grant of summary judgment following discovery and still remanded for further development of the record.  227 F.3d at 52.

The Court notes that Ivy bears the ultimate burden of demonstrating the invalidity of the prison's policy.  As the Supreme Court has emphasized repeatedly, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  *Overton*, 539 U.S. at 132 (citations omitted).  "The burden, moreover, is not on the State to disprove the validity of prison regulations but on the prisoner to disprove it."  *Id.*  Whether Ivy can meet this burden is a determination that must await development of the record.  At this stage, his allegations are sufficient to survive Defendants' motion to dismiss his First Amendment claim against Winters.

The Defendants make two, alternative arguments in support of dismissal of this claim.  First, they argue categorically that no "First Amendment claim … of freedom of association in the context of providing legal assistance to other inmates… is recognized in this Circuit."  ECF No. 14, p. 10.  As noted, the *Turner* analysis applies to inmate freedom of association claims.  *Overton*, 539 U.S. at 132–36.  Although application of the *Turner* factors is permissible on a motion to dismiss when it is a matter of "common sense" that the regulation or practice is reasonably related to legitimate penological interests, *see Ramirez*, 379 F.3d at 127 (citing *Amatel v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998)), the record here is insufficient to allow the Court to apply the *Turner* factors to the DOC policy at issue.  Indeed, the parameters of the policy and its application to Ivy's activities are not entirely clear from the face of the Complaint.  As reflected in the cases cited by Defendants, the courts that have rejected an inmate's First Amendment claim arising from assistance of other inmates in preparing legal work had the benefit of a developed summary judgment record to allow proper application of the *Turner* factors.  *See* ECF No. 14, pp. 10-11 (citing *Cooper v. Pa. Dep't of Corr.*, 756 Fed. Appx. 130, 133 (3d Cir. 2018); *Shaw v. Murphy*, 532 U.S. 223 (2001); *Walker v. Campbell*, 2011 WL 6153104, at *5 (W.D. Pa. Oct. 31, 2011), *report and recommendation adopted*, 2011 WL 6176808 (W.D. Pa. Dec. 9, 2011).  In *Wisniewski v. Fisher*, another case cited by Defendants, the Court of Appeals for the Third Circuit held that where prisoner-to-prisoner legal assistance "was both pursuant to [the plaintiff's] job duties [at the prison] and in accordance with prison regulations, [and] was not inconsistent with legitimate penological interests," such assistance "could fall within the limited First Amendment rights that prisoners retain."  857 F.3d 152, 156-57 (3d Cir. 2017).  Thus, case law does not categorically reject such claims.[8]  The capacity in which Ivy was assisting

---

[8] Defendants' last case in support of this argument, *Carter v. Dragovich*, 1999 WL 549030, at *2 (E.D. Pa. July 27, 1999), predates the Supreme Court's decision in *Shaw v. Murphy*, which reaffirmed the necessity of applying the *Turner* factors.  Accordingly, this case is of limited persuasive value.

other inmates is not presently clear.  In such a case, it is premature to dismiss a plaintiff's First Amendment claim.  *See Cooper*, 756 Fed. Appx. at 134.

The Defendants also contend that Ivy was improperly taking up time in the library to assist others under the pretense that he had his own upcoming legal deadlines.  ECF No. 14, pp. 13-14 ("It would seem beyond dispute that the prison has an interest in ensuring that the legal resources made available to inmates are managed appropriately and all inmates are afforded appropriate access. Plaintiff has acknowledged that he used library time procured under the guise of an upcoming deadline to work on another inmate's case.").  This argument, which emphasizes the need to preserve prison legal resources for fair distribution among all inmates, is facially reasonable.  It seems to fit best within the third *Turner* factor, which asks, "[what] impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Turner*, 482 U.S. at 90.  However, this factor cannot (except in the rarest of circumstances) be evaluated on the pleadings alone.  *See Ramirez*, 379 F.3d at 12; *Tootle v. Long*, 2021 WL 3610034, at *5 (W.D. Pa. July 19, 2021) (slip copy), *report and recommendation adopted*, 2021 WL 3603621 (W.D. Pa. Aug. 13, 2021).  Proper analysis of this factor requires factual development.  *Id.* On the current record, the Court lacks the information it needs to assess whether punishing inmates for doing legal work for another inmate bears a reasonable relationship to legitimate penological interests.

The Defendants also argue that Ivy's claim fails because he does not fall within the class of inmates possessing First Amendment rights recognized by the Third Circuit in *Wisniewski*, 857 F.3d at 156-57.  Unlike the plaintiff in *Wisniewski*, Defendants argue, Ivy was not working as an inmate law library legal clerk, but instead provided legal assistance to other inmates "[a]s an act of pure altruism."  ECF No. 14, p. 11 (citing Ivy's Complaint [ECF No. 5, ¶ 19]).  The Defendants are

correct that the Court of Appeals in *Wisniewski* recognized the viability of the plaintiff's claim based, in part, on the fact that the legal assistance he provided to other inmates was "pursuant to [the plaintiff's] job duties" at the prison and "in accordance with prison regulations…." *Wisniewski*, 857 F.3d at 156-57.  Ivy does not allege that he was employed as a law clerk or an equivalent position. *See Cooper*, 756 Fed. Appx. at 133-34 (remanding for district court to consider whether an inmate's job duties were consistent with that of an inmate law library clerk under *Wisniewski*).  But the Court's holding in *Wisniewski* was still the product of a thorough analysis of the *Turner* factors and should not be read as foreclosing a First Amendment claim except where the plaintiff served as a law library clerk whose responsibilities included providing such assistance.  The facts may well demonstrate that Ivy does not fall within the limited class of inmates whose legal assistance of others has been accorded First Amendment protection.  Indeed, Ivy faces a "heavy burden" to "overcome the presumption that the prison officials acted within their 'broad discretion'" in the management of the prison.  *Shaw*, 532 U.S. at 232 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 413 (2001)).  But, again, this determination must await development of a proper factual record and the Court's full assessment of the *Turner* factors.

As to Defendant Blake, however, Ivy's allegations are insufficient to establish her involvement in plausibly actionable conduct.  Therefore, Ivy's First Amendment claim will be dismissed against her but with leave to file an amended complaint if Ivy is able to allege facts to state a claim against her.

> D.  Ivy Has Not Stated a Claim for Invasion of Privacy Because He Has Pleaded No Protected Privacy Interest

Ivy's Complaint asserts that Winters and Blake violated his right to privacy by (1) photocopying his legal mail and legal documents to preserve them for DOC records, (2) showing his legal mail and legal documentation to inmate law clerk Fritchman, and (3) reading and censoring

the legal work he printed from the library's computer.  ECF No. 5, ¶ 91.  Count IV contends that this conduct violated his right to privacy under the First, Fourth, and Fourteenth Amendments.  *Id.*  Count V alleges that the same actions violated his right to privacy under Pennsylvania state law.  *Id.*, ¶ 92.  Ivy's allegations fail to state a claim for invasion of privacy under any of these constitutional amendments or state law because he lacks a protected privacy interest in any of these materials.

To begin with, Ivy has failed to plead Blake's involvement in the alleged invasion of privacy.  The conclusory allegation that she "created and implemented the policy, practice, or custom" of reviewing and photocopying inmates' legal materials and that she censored and confiscated "free speech materials" lacks any facts to support an inference that she deprived Ivy of any privacy right.  ECF No. 5, ¶ 82.  *See Iqbal*, 129 S. Ct. at 1949-50 (a complaint must do more than allege "naked assertions devoid of further factual enhancement," and the court is not "bound to accept as true a legal conclusion couched as a factual allegation.").  All of Ivy's invasion of privacy claims against Blake must be dismissed on that basis.

Penological imperatives, including the paramount importance of prison security, diminish the privacy rights of those incarcerated in prisons.  *See Hudson v. Palmer*, 468 U.S. 517 (1984).  The Supreme Court in *Hudson* "concluded that the Fourth Amendment right to privacy, to be free from unreasonable searches, is fundamentally inconsistent with incarceration."  *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) (citing *Hudson*, 468 U.S. at 529 (1984) (holding that prisoners have no Fourth Amendment right to privacy in their cells).  The appropriate inquiry for the applicability of the Fourth Amendment's protection against unreasonable searches and seizures turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."  *Smith v. Maryland*, 442 U.S. 735, 740 (1979).  The court in *Rasheed v. Mayer* held that prison officials had not violated the Fourth Amendment

when, upon an inmate's transfer from federal custody to a county jail, officers confiscated his legal

materials for five days while internal affairs reviewed the documents as part of a narcotics smuggling

investigation.  2020 WL 7344022, at *1-2, *4 (W.D. Pa. Nov. 23, 2020) (relying on *Hudson*, 468 U.S.

at 527-28).  Librarian Winters' request to see Ivy's legal documents to verify that he had upcoming

deadlines also serves the DOC's interest in institutional order and management of resources by

balancing an individual inmate's need for additional law library time with the ability of all inmates to

use the law library.  The Constitution affords prison administrators significant discretion regarding

prison regulation and administration.  *See, e.g., Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S.

119, 126 (1977) ( "Because the realities of running a penal institution are complex and difficult, we

have also recognized the wide-ranging deference to be accorded the decisions of prison

administrators.").  Ivy "has no possessory interests" in his legal documents which Winters read and

showed to another inmate "which society is prepared to accept as reasonable."  *Dean v. Folino*, 2011

WL 4527352, at *2 (W.D. Pa. Aug. 22, 2011) (citations omitted), *report and recommendation adopted*,

2011 WL 4502869 (W.D. Pa. Sept. 28, 2011).

Ivy's failure to assert a reasonable expectation of privacy also means that he has failed to

state a claim for invasion of privacy under state law.  The tort of invasion of privacy in its intrusion

on seclusion form requires a plaintiff to plead "an intentional intrusion upon the seclusion of

[plaintiff's] private concerns which was substantial and highly offensive to a reasonable person, and

…sufficient facts to establish that the information disclosed would have caused mental suffering,

shame or humiliation to a person of ordinary sensibilities." [9]  *Boring v. Google Inc.*, 362 Fed. Appx. 273,

279 (3d Cir. 2010) (quoting *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 570 Pa. 242, 809 A.2d

---

[9] The Court agrees with the Defendants that of the invasion of privacy claims recognized in Pennsylvania, intrusion
upon seclusion best fits Ivy's allegations.  *See* ECF No. 14, p. 17; *Marks v. Bell Tel. Co. of Pa.*, 331 A.2d 424, 430 (Pa. 1975)
(explaining the "four distinct torts" for invasion of privacy under Pennsylvania law).

243, 247 (Pa. 2002)).  The privacy invasion may occur "(1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or (3) some other form of investigation or examination into plaintiff's private concerns." *Harris v. Easton Publishing Co.*, 483 A.2d 1377, 1383-84 (Pa. Super. Ct. 1984).  Further, unlike libel and slander claims, publicity is not an element of the claim of intrusion on seclusion invasion of privacy.  *Id.*  The mere fact of an intrusion on private affairs is insufficient; the conduct must have been "highly offensive to a reasonable person." *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 543 A.2d 1181, 1186–87 (Pa. Super. Ct. 1988)).  *See also Marks v. Bell Telephone Co. of Pa.*, 460 Pa. 73, 331 A.2d 424 (Pa. 1975).  Moreover, although persistent intrusions are illustrative of the cause of action in the Restatement (Second) of Torts, Section 652B (which Pennsylvania has adopted), "it is clear that the important point is not that the intrusions be persistent but that the intrusions should by one means or another…rise to the level of what a reasonable person would find 'highly offensive.'" *Diaz v. D.L. Recovery Corp.*, 486 F. Supp. 2d 474, 480 (E.D. Pa. 2007), *cited approvingly by Boring*, 362 Fed. Appx. at 279 (3d Cir. 2010).

Nothing the Defendants examined was private and none of their conduct would be highly offensive to a reasonable person.  ECF No. 14, p. 17-18.  First, the habeas corpus petition that Ivy printed from a public printer in the library on Winter's desk was not private.  Ivy printed to a shared printer, stationed on Winter's desk, that was visible to anyone in the library.  Considering these circumstances, Ivy did not have a reasonable privacy interest in the habeas corpus petition he printed for another inmate.  *See Campbell v. Woodard Photographic, Inc.*, 433 F. Supp. 2d 857, 861 (N.D. Ohio 2006) (assuming that, in an office, "obtain[ing] an eBay summary from a printer tray in plain view" is not invasion of privacy).  Second, Ivy did not have a reasonable expectation of privacy in his legal papers that the librarians required him to show as a condition of getting additional time in the law library.  The court docket and appellee's brief that Ivy was required to disclose were matters

21

of public record.  *See Williams v. Claims Overload Sys., Inc.*, 1998 WL 104476, at *3 (E.D. Pa. Feb. 25,

1998).  In *Williams*, the court dismissed an invasion of privacy claim based on a background check

which revealed that a criminal complaint had been filed against the plaintiff because "Williams could

have no reasonable expectation of privacy in public court documents such as the published opinion

in the criminal case against Williams."  *Id.*  Information on a court's docket in 2021 is available to the

public, often readily via online access.  Additionally, because of their incarceration, inmates' privacy

rights are far more limited than that of citizens at liberty.  *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)

("given the realities of institutional confinement, any reasonable expectation of privacy that a

detainee retained necessarily would be of a diminished scope.").  Finally, it would not be highly

offensive to a reasonable person who is incarcerated to have to share a court docket sheet and a

publicly available appellate brief with a law librarian to verify that he had an upcoming filing

deadline.  *Harris*, 483 A.2d at 1383-84.  Accordingly, Ivy has also failed to plead a state law claim for

invasion of privacy.

Ivy's state law invasion of privacy claim must also be dismissed because the Defendants

possess state sovereign immunity.  ECF No. 14, p. 15–18.  Sovereign immunity under Pennsylvania

law provides state officials and employees with broad immunity from most state-law tort claims

when "acting within the scope of their duties…except as the General Assembly shall specifically

waive the immunity."  1 Pa. C.S. § 2310; *Sears v. McCoy*, 2021 WL 254067, at *7 (M.D. Pa. Jan. 26,

2021).  In addition, "sovereign immunity applies even to intentional torts committed by

Commonwealth defendants acting in their individual capacities."  *Id.* (citing *Story v. Mechling*, 412 F.

Supp. 2d 509, 518 (W.D. Pa. 2006), aff'd, 214 Fed. Appx. 161 (3d Cir. 2007)).  The Pennsylvania

General Assembly has waived immunity for nine categories of claims, none of which encompass

Ivy's invasion of privacy claims.  *See* 42 Pa. Const. Stat. Ann. § 8522.  It is also clear from the

pleadings that the Defendants were acting within the scope of their employment under Pennsylvania

state law when they engaged in the conduct alleged by Ivy.  *See Chin v. Chrysler LLC*, 538 F.3d 272,

278 (3d Cir. 2008) (scope of employment determined under Pennsylvania state law).  *See Justice v.*

*Lombardo*, 208 A.3d 1057, 1066-67 (Pa. 2019) (applying Restatement (Second) of Agency §§ 228–235

(Restatement) (1958) to determine scope of employment).  All alleged acts took place at SCI-

Forest—their place of employment—during working hours.  Where "the servant…does the kind of

act which he is authorized to perform within working hours and at an authorized place, there is an

inference that he is acting within the scope of employment."  Restatement (Second) of Agency § 235

(1958) cmt. a.  They undertook acts serving their employer: upon his visit to the law library, Winters

requested documentation to show Ivy's upcoming court deadline to authorize him with additional

time [ECF No. 5, ¶¶ 22–25]; Winters, "in conformity with the practice and custom" photographed

these documents for library records and verification of the deadline, *id.*, ¶¶ 26-27, 30; and Winters

read documents Ivy sent from the law library computer to the printer on her desk, which she then

confiscated and issued a confiscation slip.  *Id.*, ¶¶ 13, 40, 42-43; ECF No. 5-1.  All these duties serve

the purposes of the Defendants' employer in the orderly operation of the prison's law library and fall

within their scope of employment.  Accordingly, sovereign immunity under Pennsylvania law shields

Winters and Blake from Ivy's state law invasion of privacy claims.

  Ivy also fails to state a claim for invasion of privacy under the Fourteenth Amendment.[10]

The touchstone of the analysis of Fourteenth Amendment confidentiality rights is "whether [the

disclosure is] within an individual's reasonable expectations of confidentiality.  The more intimate or

personal the information, the more justified is the expectation that it will not be subject to public

---

[10] Two types of privacy rights are traditionally protected under the Fourteenth Amendment: "confidentiality rights"—
i.e., "the individual interest in avoiding disclosure of personal matters," and "autonomy rights"—"the interest in
independence in making certain kinds of important decisions." *Malleus v. George,* 641 F.3d 560, 564 (3d Cir. 2011) (citing
*Whalen v. Roe*, 429 U.S. 589, 599-600 (1977); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005)).  In this case,
Ivy's allegations more closely approximate a confidentiality right than an autonomy right and will be analyzed under that
rubric.

scrutiny." *Malleus v. George*, 641 F.3d 560, 564 (3d Cir. 2011) (quoting *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 112–13 (3d Cir. 1987)).  The Third Circuit has provided a non-exhaustive list of six categories of protected information: (1) a private employee's medical information when sought by the government, (2) medical, financial and behavioral information relevant to a police investigator's ability to work in dangerous and stressful situations, (3) prescription records of a public employee, (4) a minor's pregnancy status, (5) sexual orientation, and (6) an inmate's HIV status.  *Id.* at 564-65 (citing *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980); *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 113-16 (3d Cir. 1987); *Doe v. Southeastern Pa. Trans. Auth.*, 72 F.3d 1133, 1138 (3d Cir. 1995); *Gruenke v. Seip*, 225 F.3d 290, 301 (3d Cir. 2000); *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000); *Doe v. Delie*, 257 F.3d at 309, 317, 323 (3d Cir. 2001)).  Ivy's asserted interest in the privacy of his legal papers does not fit within one of those six categories.  Nor was the information in his legal documents so intimate and personal that it falls within the Fourteenth Amendment's protections.  As explained above, Ivy had no reasonable expectation of privacy in the papers discussed in his Complaint.  *See also Com. v. Moore*, 928 A.2d 1092, 1099 (Pa. Super. Ct. 2007) (no reasonable expectation of privacy in incoming and outgoing prisoner mail under Fourth Amendment).  For the foregoing reasons, all of Ivy's invasion of privacy claims will be dismissed with prejudice as to all Defendants.

     E.  Ivy's Procedural Due Process Claim Fails Because Seventy-Five Days in Disciplinary Custody Does Not Implicate a Liberty or Property Interest.

     To implicate protections under the Due Process Clause of the Fourteenth Amendment, a state actor must deprive the plaintiff of either a property interest or a liberty interest.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  Ivy has failed to plead a constitutionally protected liberty interest based on alleged deficiencies in the procedures followed during his misconduct hearing.  Depriving already-incarcerated persons of liberty requires due process

protections only if the deprivation imposes an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The determination of what is "atypical and significant" depends on the range of conditions an inmate would reasonably expect to encounter while incarcerated. *See Asquith v. Dep't of Corr.*, 186 F.3d 407, 412 (3d Cir. 1999). Depending on their severity, sanctions imposed because of a guilty finding on a prison misconduct may constitute an "atypical and significant hardship" that implicates the Due Process Clause. *See Wolff v. McDonnell*, 418 U.S. 539, 564–66 (1974) (when an inmate faces revocation of "good time credits" affecting his criminal sentence, prison officials must (typically) provide him certain due process protections). But sanctions that fall short of this threshold do not trigger such protection. In *Sandin*, for example, the Court held that because a thirty-day punitive segregation in the prison was not an atypical or significant hardship for an inmate, it implicated no liberty interest, and thus the protections of the Due Process Clause did not apply. *Sandin*, 487 U.S. at 487.

Here, Ivy was sentenced to seventy-five days of disciplinary confinement. ECF No. 5, ¶ 90. This sanction falls well short of an "atypical and significant hardship" sufficient to implicate a liberty interest and trigger procedural due process protections under *Sandin*. *See Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) (seven months solitary confinement was not an atypical or significant hardship); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) (fifteen months administrative segregation). This precludes Ivy's procedural due process claim even if the Defendants violated DOC or prison policies, procedures, or ethical rules. *See Lee v. Schrader*, 2014 WL 2112833, at *4 (W.D. Pa. May 20, 2014) ("[T]he simple fact that state law prescribes certain procedures does not mean that the procedures thereby acquire a federal constitutional dimension") (citing *United States v. Jiles*, 658 F.2d 194, 200 (3d Cir. 1981) (other citations omitted). The United States Constitution provides the floor of constitutional due process protections below which state officials may not go, but states remain free to create procedures not compelled or enforceable by reference to the

Constitution.  *See Shango v. Jurich*, 681 F.2d 1091, 1101-02 (7th Cir. 1982) ("[A] state created procedural right is not itself a liberty interest….States may decide to engage in such proceedings, but the due process clause does not compel them to do so because no constitutionally cognizable substantive interest of the prisoner is at stake.").[11]  His procedural due process claim must be dismissed as to all Defendants.

      F.   Ivy's Complaint Fails to State a Conspiracy Claim Under Pennsylvania State Law.

Ivy alleges in a conclusory manner that all Defendants engaged in a conspiracy to punish him for exercising his rights of association and free speech when he helped Fritchman with his habeas petition.  ECF No. 5, ¶¶ 75, 79, 90.  However, "mere conclusory allegations of deprivations of constitutional rights are insufficient to state a conspiracy claim."  *Tindell v. Beard*, 351 Fed. Appx. 591, 594 (3d Cir. 2009).  Rather, the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."  *Capogrosso v. The Supreme Court of the State of New Jersey*, 588 F.3d 180, 184-85 (3d Cir. 2009).  Ivy's Complaint does not allege "facts that plausibly suggest a meeting of the minds."  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179 (3d Cir. 2010).  The law is clear: "bare allegations of wrongdoing by a Defendant, without any substantiating proof of an unlawful agreement, are insufficient to state a conspiracy claim."  *Carey v. Johnson*, 2008 WL 724101, at *10 (W.D. Pa. Mar. 17, 2008).  Such is the case here.

V.     Leave to Amend

The Third Circuit has instructed that if a civil rights complaint is vulnerable to dismissal for failure to state a claim, the Court should permit a curative amendment unless an amendment would

---

[11] Ivy's Complaint also alleges that all Defendants violated his right to due process under the Fourteenth Amendment by "failing to provide Plaintiff with adequate notice that his behavior, in assisting another inmate with preparing Habeas Corpus documentation for Federal Court, constitute misconduct under the institution's rules and regulations."  ECF No. 5, ¶ 93.  This charge similarly does not support a due process claim.

be inequitable or futile. *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir. 2002).  Leave to amend is inappropriate if the complaint, as amended, would not survive a motion to dismiss for failure to state a claim. *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir. 2002).  This instruction applies equally to *pro se* litigants and those represented by counsel. *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir. 2004).  Ivy may file an amended complaint as to the claims that the Court has not dismissed with prejudice and as set forth in this opinion.

The Court reminds Ivy that an amended complaint "must be complete in all respects.  It is a new pleading which stands by itself as an adequate complaint without reference to the complaint already filed." *Williams v. Ferdarko,* 2018 WL 3653272, at *1 n.1 (W.D. Pa. Aug. 1, 2018) (quoting *Young v. Keohane,* 809 F. Supp. 1185, 1189 (M.D. Pa. 1992)).  This means that the Amended Complaint must restate all allegations he plans to pursue.  In his Amended Complaint, Ivy should (1) differentiate his claims among the defendant or defendants he is suing, (2) provide a short and plain statement of the facts in accordance with Rule 8 of the Federal Rules of Civil Procedure, (3) identify what each defendant did or did not do, when, for how long, and if the violations of rights are ongoing, (4) and what relief he is seeking.

VI.    Conclusion

Defendants' motion to dismiss Ivy's Complaint at ECF No. 14 is granted in part and denied in part as follows:

1.    Although the Defendants have not attacked the merits of Ivy's retaliation claim in Count I, this claim will be dismissed as to Defendants Wetzel, Dombroski, Gustafson, Perry, Adams, and Mongelluzzo because the facts alleged do not support their personal involvement as required for a claim under § 1983.  As to these Defendants, the claim is dismissed with prejudice.  The claim remains pending

27

against Defendants Winters and Blake.  All other claims against Wetzel, Gustafson, Perry, Adams, and Mongelluzzo are also dismissed with prejudice.

2. Ivy's claims against Dombroski are dismissed without prejudice and with leave to file an amended complaint.

3. The motion to dismiss Count II of the Complaint is denied as to Defendant Winters but granted as to all other Defendants.  Dismissal is with prejudice except as to Defendant Blake.  As to Blake, Ivy may file an amended complaint.

4. Counts III, IV, V, and VI of the Complaint are dismissed with prejudice as to all Defendants.

5. Ivy's claims for money damages against the Defendants in their official capacities are dismissed with prejudice.

Within twenty-one days from the entry of this Order, Ivy may file an amended complaint in accordance with this Memorandum Opinion.  His failure to file an amended complaint within this period will be considered a waiver of his right to amend and, in that event, the claims dismissed herein without prejudice will be dismissed with prejudice.  An appropriate order follows.

HON. RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE

Entered this 30th day of September 2021.

28